IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ERICKSON MEKO CAMPBELL,<br>   Defendant. | Case No.: 3:14-CR-46 (CAR) |

**PETITION FOR WRIT OF *AUDITA QUERELA***

COMES NOW the defendant, Erickson Meko Campbell, by and through counsel, and petitions this Court to issue a writ of *audita querela* and reduce his sentence to a term of probation. In support of this petition, he states:

**SUMMARY**

After eight and a half years on pre-trial and appellate supervised release, Mr. Campbell, now 52 years old, is poised to serve the 28-month sentence that this Court imposed in January of 2016. R56 (judgment) at 2. It has been about nine years and one month since the date of this transgression, without any further criminal acts or technical violations on his part. It has been nearly fifteen years since his release from prison, and twenty-two years since the felony theft that put him there. Put simply, Mr. Campbell is getting better, and any threat of recidivism or to public safety has consistently diminished with the passage of time. This prolonged period of impeccable behavior while under supervised release is a powerful and rare testament to his fitness to serve a probationary sentence in this case. For the below reasons, this Court has the power to permit him to do so under the unique circumstances of this case.

1

**PROCEDURAL POSTURE**

Nearly a decade ago, officers pulled Mr. Campbell over and found a firearm in his trunk. As he was a felon, the government charged him with violating 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Mr. Campbell moved to suppress, arguing that his traffic stop was unlawful at its inception and unconstitutionally prolonged. This Court denied his motion after an evidentiary hearing, in August of 2015. It sentenced him to a 28-month term of imprisonment. R56 (judgment) at 2.

Mr. Campbell appealed the decision. In January of 2019, the Eleventh Circuit affirmed this Court after hearing oral arguments. It stayed its mandate, however, and in August of 2020, vacated its initial opinion and replaced it with a different opinion, still affirming this Court. It ruled that the stop violated Mr. Campbell's Fourth Amendment rights, but that the good faith exception to the exclusionary rule applied to these circumstances. At this point, Mr. Campbell moved for an *en banc* rehearing. The Eleventh Circuit granted his motion, and, after another round of briefing and an *en banc* oral argument, it affirmed, 7-to-5.

Subsequently, attorney Michael Dreeben, former deputy solicitor general for the United States in charge of the Supreme Court's criminal docket, contacted the undersigned with interest in pursuing a petition for writ of certiorari on Mr. Campbell's behalf. Mr. Campbell and the undersigned agreed, and Mr. Dreeben and his team drafted and filed a petition for writ of certiorari in the United States Supreme Court. Meanwhile, this Court maintained Appellant's bond, and granted a stay of surrender pending the resolution of the writ petition. Ultimately, the Supreme Court denied the petition.

**REASONS FOR GRANTING THE WRIT**

A. The Writ of *Audita Querela*

Given the extraordinary life of this case, it is only fitting that Mr. Campbell make a final, extraordinary request, using as a vehicle an extraordinary writ. He first outlines the history and nature of the writ of *audita querela*, then explains how the circumstances of his case gives this Court the jurisdiction and common law authority to issue the writ, and finally argues that this Court should exercise its discretion to do so.

"Audita querela" is Latin for "the complaint having been heard." *United States v. Holt*, 417 F.3d 1172, 1174 (11th Cir. 2005). It "allowed petitioners to concede the legal validity of a judgment at the time it was rendered, but challenge its continued execution due to inequities at the time of judgment in conjunction with matters that arose after the [sic] its rendition." Fountain, Caleb J., *Audita Querela and the Limits of Federal Nonretroactivity*, 70 N.Y.U. ANNUAL SURV. OF AM. L. 203, 207 (2014); *see also* BLACK'S LAW DICTIONARY 126 (7th ed. 1999).

In English common law and in the United States, the writ of *audita querela* has always comprised both equitable and legal components. *Cf.* Fountain, 70 N.Y.U. ANNUAL SURV. OF AM. L. at 217-220.

> From its inception in the fourteenth century through its abolition in American federal civil proceedings in 1946, *audita querela* occupied an obscure space among the panoply of postjudgment remedies. However, one notable trend has remained constant, and deeply informs the writ's use today: it has consistently afforded litigants, on account of some equitable defense, the opportunity to present legal arguments that are otherwise unavailable on account of a statute or other law.

3

*Id*. at 226. "Nowhere in the case law is there a hard-and-fast rule requiring a perfect 'legal' claim within the four corners of the complaint, . . . ." *Id*. at 225. Rather, *audita querela* has always "functioned as an *equitable vehicle* to air *legal objections* to the continued execution of a judgment." Fountain, 70 N.Y.U. ANNUAL SURV OF AM. L. at 209 (italics in original.) It has "involved an informal two-step process of the petitioner establishing an equitable claim, and subsequently a legal defense." *Id*.

In 1946, the promulgation of Federal Rule of Civil Procedure 60(b) abolished the writ in civil practice. Eight years later, the Supreme Court clarified that common law writs remain viable in the criminal context under the "all writs section of the Judicial Code[.]" *United States v. Morgan*, 346 U.S. 502, 506, 511 (1954); *see* 28 U.S.C. § 1651(a) ("The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions agreeable to the usages and principles of law.") It clarified that "the enactment of § 2255" was not "a bar to this motion," and held "that the District Court has power to grant such a motion." *Id*. at 511. However, courts should exercise their discretion "only under circumstances compelling such action to achieve justice." *Id*.

The Eleventh Circuit has confirmed that the writ of *audita querela* specifically survives 28 U.S.C. § 2255. *Holt*, 417 F.3d at 1175. Drawing from *Morgan*, 346 U.S. at 510-11, it noted that "28 U.S.C. § 2255 was not enacted to provide the exclusive remedy for a prisoner to obtain postconviction *habeas corpus* relief in all circumstances." *Holt*, 417 F.3d at 1175. Rather, " 'federal courts may properly fill the interstices of the federal postconviction remedial framework through remedies available at common law.' " *Id*. (quoting *United States v. Ayala*, 894 F.2d 425, 428 (D.C.Cir. 1990)). It made clear, however, that "fill[ing] the interstices" left by 28

4

U.S.C. § 2255 is not a license to get around the many procedural hurdles to obtaining a § 2255 remedy. *Id*. Rather, only when claims are not "cognizable" in a § 2255 motion can a litigant obtain a remedy from one of the common law writs. *Id*. Hence, it treated Mr. Holt's petition for writ of *audita querela* as a motion to vacate, and held such a motion was unauthorized because the Court had not authorized a second or successive motion. *Id*. at 1175.

One category of claims not "cognizable" in a § 2255 motion is post-judgment equitable claims – such a claim does not argue this court's judgment was erroneous at the time it was imposed, but that enforcing the judgment would now be unjust, based on subsequent developments. At the same time, this claim is not purely equitable. Rather, Mr. Campbell argues below that evidence arising between the imposition and execution of his sentence changes the calculus under 18 U.S.C. § 3553(a), such that his 28-month prison sentence would now be "greater than necessary" to satisfy the statutory sentencing factors. *Audita querela* is designed for precisely this sort of claim.

B. The Writ of *Audita Querela* is an appropriate vehicle in this case to modify Mr. Campbell's sentence.

Preliminarily, this Court has jurisdiction to hear and grant this petition. A common law post-conviction petition is part of the original case or controversy to which it pertains, because it is a "step" in the criminal case. "[B]ecause the court had original jurisdiction over the 'case,' and the petition contests the validity or continued application of the judgment, it remains within the court's contemplation." Fountain, 70 N.Y.U. Annual Surv. of Am. L. at 231; *see Morgan*, 346 U.S. at 505 n.4 ("Such a motion [for writ of *coram nobis*] is a step in the criminal case and not, like habeas corpus where relief is sought in a separate case and record, the beginning of a separate

5

civil proceeding."); *United States v. Denedo*, 556 U.S. 904, 913 (2009) (same). Hence, this court has original jurisdiction over this petition under 18 U.S.C. § 3231.

The sparing use of *audita querela* has left the writ "shrouded in ancient lore and mystery." Fed. Rule Civ. Pr. 60 advisory committee's note. But its historical underpinnings show why it is an appropriate vehicle with which to reduce Mr. Campbell's sentence. In a nutshell, as English feudalism began to give way to a rising merchant class in the 14th Century, the King enacted statutes designed to ensure prompt debt collection, whereby debtors were automatically imprisoned upon execution of a judgment, with no opportunity to plead any defenses. Fountain, Caleb J., *Audita Querela and the Limits of Federal Nonretroactivity*, 70 N.Y.U. Annual Surv. Of Am. L. 203, 212-214 (2014). These debt collection statutes were easily abused by forgery, and other frauds, giving rise to a penal crisis. *Id*. at 214. English common lawyers created the writ of *audita querela* as a response to this crisis. *Id*.

This petition arises in an analogous context. Congress passed the Sentencing Reform Act ("SRA") of 1984, in part to streamline and equalize federal sentencing, and it included sections of the SRA and of the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), to add measures of finality to criminal judgments and sentences. The incarcerated population in this country has ballooned since the advent of these and other tough federal criminal laws, along with similar criminal laws at the state level – leading to what many consider to be a penal crisis.

At the same time, the courts have explicitly left open the availability of common law writs to "fill the interstices" left by these laws. *Holt*, 417 F.3d at 1175 (quoting *Ayala*, 894 F.2d at 428. And the doctrine of constitutional avoidance, paired with the habeas corpus clause of

the United States Constitution, counsels against construing these statutory reforms to preclude such common law remedies. *See* U.S. CONST. ART. I, SEC. 9, CL.2 ("The privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it."); c*f. I.N.S. v. St. Cyr*, 533 U.S. 289, 299 (2001) (interpreting the AEDPA and the IIRIRA[1] not to eliminate district court review of certain immigration orders via habeas corpus, absent a "clear indication that Congress intended that result" – an indication Congress provided in a subsequent statute), *abrogated by statute as stated in Nasrallah v. Barr*, _U.S._, 140 S.Ct. 1683 (2020). Thus, the AEDPA and the SRA of 1984 cannot constitutionally provide the exclusive remedies to all criminal claims in all cases. Under the United States Constitution and the case law, and notwithstanding 18 U.S.C. § 3582, there remains a common law remedy for the rare defendant in Mr. Campbell's situation – a quasi-legal and quasi-equitable pleading that embraces his unique claim that the 18 U.S.C. § 3553(a) analysis has changed significantly over a prolonged period in between the imposition and execution of his sentence. The writ of *audita querela* fits the bill.

Here, Mr. Campbell does not file this writ as a means of getting around any procedural hurdles, or other requirements of a motion filed under 28 U.S.C. § 2255. His claim is not of purely legal error, so it is not cognizable in a 28 U.S.C. § 2255. Even in light of the changing equities of his sentencing, he does not argue that this Court's sentence was an abuse of discretion. Rather he argues this Court has the authority under common law to reconsider, based on intervening events. *Cf. Pepper v. United States*, 562 U.S. 476, 490-505 (2011) (district court can consider post-sentencing rehabilitation at resentencing after successful

---

[1] The Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

7

appeal); *Concepcion v. United States*, _U.S._, 142 S.Ct. 2389, 2400-2401 (2022) (district court can consider intervening changes of law or fact in exercising discretion to reduce sentence under the First Step Act).

C.  The Evidence In Support of Granting the Writ

Since being arrested for the instant offense on September 16, 2014, and released on bond the same day, Mr. Campbell has exemplified model citizenship. According to his probation officer, Matt Latimore, he has been compliant with all the terms of his supervised release. For at least the last 5 years, has enjoyed non-reporting status.

Through the duration of appellate litigation, Mr. Campbell has maintained employment in largely blue collar, manual labor warehouse positions. Despite the long hours and physical demands of the work, Mr. Campbell has managed to incrementally increase his wages over time. According to his Presentence Report, Mr. Campbell worked full-time, installing doors, and bath and kitchen appliances for $12.80/hour, at American Woodmark Corporation, 1017 GA-42, Jackson, GA 30233, from July 12, 2011, through January 28, 2015. R53 (PSR) at 10. He then worked as a plumber's assistant in Stockbridge, Georgia, from February 2015, through September 2015. *Id*. Starting in September of 2015 – the month he entered his guilty plea in this case – he worked at Patrick Home Renovations for $8.00/hour. *Id*.

These days, he earns nearly two and half times that ($19.75/hour), as a picker and packer for DHL Supply Chain Warehouse.[2] Mr. Campbell has built up considerable experience and

---

[2] Just recently, Mr. Campbell was promoted into a permanent position as a Floater with DHL, 4505 Derrick Industrial Parkway Atlanta, GA 30349. His supervisor there, Jerald Willis, speaks favorably about Mr. Campbell's job performance and positive attitude and demeanor. Mr. Campbell works hard as a floater, unloading trucks and ensuring that products are delivered to

expertise in the supply chain industry over his years on bond. He has worked for Wayfair[3] and Amazon[4], among others, and left each company for a higher paying position. [5]

When he is not on a jobsite 40 or more hours a week, Mr. Campbell stays close to home. He rents a modest, well-kept residence in McDonough with his 75-year-old mother, Betty Williams, who was widowed in 2010. Ms. Williams appreciates her son's doting personal assistance and essential economic support at this late stage of her life. Mr. Campbell's third shift warehouse work allows him to accompany his mother to regular medical appointments for treatment of scoliosis, hypertension, and osteoporosis; facilitate their participation in congregational activities at Eagle's Landing First Baptist Church in McDonough; and otherwise provide substantial eldercare. Ms. Williams reports that she drives less than she used to and depends on her son to do all the household chores and maintenance beyond the cooking and light housekeeping she can still manage. Together, they sustain a quiet, peaceful household for

---

the research department for preparation and shipping, as well as keeping every workstation in the department fully supplied. If other departments are short-handed, Mr. Campbell can be counted on to fill in those personnel gaps on a temporary basis.

[3] He worked for Wayfair, 130 Distribution Dr., McDonough, GA, 30252, from November 12, 2015 until April 12, 2019. His former supervisor there was Josh.

[4] He worked for Amazon, 2255 W. Park Place Blvd., Stone Mountain, GA 30087, from May 6, 2019, until May 11, 2021. His former supervisor there was Travis.

[5] He worked for Wholesale Glass Distributions as a delivery driver form February 14, 2021, until February 4, 2022. His former supervisor there is Mike. Drawn by successively higher wage offers, Mr. Campbell then moved on to Phillips-Van Heusen Warehouse, 127 Liberty Industrial Parkway McDonough, GA 30253 for several months, and then Mudpie Company, 4893 Lewis Road Stone Mountain, GA 30083 before settling in presently at DHL about six months ago.

which Betty Williams is grateful.[6]




Williams/Campbell home:  
409 Autumn Lake Ct. McDonough, GA

Ms. Betty Williams & son, Erickson Campbell

Not only has Mr. Campbell dedicated himself to working hard and attentively caring for his mother in his years on bond, but he has also taken steps recently to better himself professionally. In early 2022, Mr. Campbell began working with a recruiter, Sonya Brown, for

---

[6] According to Ms. Williams, she is not in a position financially to afford even the most basic assisted living care should she be faced with living alone. Her retirement is financed exclusively through a monthly social security check. She depends on her son to contribute several hundred dollars every month to housing and daily living expenses to maintain their modest lifestyle. While the fact that a defendant's family might incur some degree or financial hardship or suffer from the absence of the defendant through incarceration are not ordinarily considered in crafting departures to sentencing, the loss of caretaking and financial support that Mr. Campbell offers his elderly and ailing mother is unique and noteworthy.  In the instance, the loss of caretaking and financial support to Ms. Williams substantially exceeds the harm ordinarily incident to incarceration of a similarly situated defendant, and there are no alternative remedial or ameliorative programs available to Ms. Williams.  Simply put, Mr. Campbell's caretaking and financial support are irreplaceable to the welfare of his mother at this time and granting this motion will effectively address the loss of caretaking and financial support that Ms. Williams would otherwise suffer.

10

Swift Transportation Company with the goal of obtaining a Class A Georgia Commercial Driver's License (CDL).[7] This past spring, Mr. Campbell completed a 40-hour online training sponsored by Swift Transportation for aspiring commercial drivers. Likewise, he secured DOT certification of his physical fitness to drive with a Class A commercial license.[8] Mr. Campbell has been studying daily as he prepares to take and pass the Georgia Department of Motor Vehicles CDL skills test later this month. Once that test is under his belt, Mr. Campbell is invited to attend a 3-week fully

---

[7] Driving a Commercial Motor Vehicle (CMV) requires a higher level of knowledge, experience, skills, and physical abilities than that required to drive a non-commercial vehicle. To obtain a Commercial Driver's License (CDL), an applicant must pass both skills and knowledge testing geared to these higher standards. Additionally, CDL holders are held to a higher standard when operating any type of motor vehicle on public roads. Serious traffic violations committed by a CDL holder can affect their ability to maintain their CDL certification.

[8] 

11

subsidized, residential Entry Level Driver's Training Course at Swift's Trucking School in Waco, Georgia.[9]

Cognizant of both his supervised release reporting obligations and caregiving responsibilities, Mr. Campbell does not envision becoming a long-haul, big rig truck driver who ranges far from home for weeks on end. He does, however, hope to improve his – and by extension his mother's – economic security as they both age. Given his many years of warehouse work, Mr. Campbell has reached his maximum earning potential in an industry centered around a largely temporary workforce of low-skilled, manual labor positions. With a Class A CDL, Mr. Campbell will be well-positioned to break through the $20/hour wage ceiling he is currently laboring under and pursue in-state, "turnaround" CDL work with ample advancement opportunities as he gains experience.[10]

While Mr. Campbell and his mother both accept that he must pay his debt to society for his offense, his behavior over the last eight years reflects that he deeply internalized his transgressions when he pled guilty in 2015. He has spent every day since then atoning for those errors. Considering Mr. Campbell's impeccable history while out on bond, it's obvious that his maturity has only grown throughout the saga of reckoning with the legal resolution of this case over a prolonged period. Indeed, the greatest barrier now to Mr. Campbell's ability to continue his already successful reintegration into his Middle Georgia community, where he has settled

---

[9] Class A CDL training prepares students to land an entry-level job operating a Class A commercial motor vehicle. Class A vehicles are defined as any combination of vehicles with GVWR of 26,001 or more pounds provided the GVWR of the vehicles being towed is more than 10,000 pounds.

[10] *See,* Ziprecruiter's current job listings for short-run commercial driving.

into a family-centered life around work and caregiving, is a prison sentence. Moreover, it goes without saying that any prison term would necessarily punish his wholly innocent mother, Betty Williams.[11] Accordingly, a modification of Mr. Campbell's sentence to an extended probationary term would be sufficient punishment to meet the sentencing goals before this Court.

Undersigned counsel has consulted with U.S. Probation Officer Matt Latimore, who has supervised him for about the past two and a half years. He represents that he has had no issues with Mr. Campbell's compliance, and he takes no position on this motion. Undersigned counsel has also consulted Assistant United States Attorney Michelle Schieber, who represents that the government takes no position on Mr. Campbell's motion and request for a sentence to a probationary term.

D. This court should exercise its discretion, grant this petition, and reduce Mr. Campbell's sentence to a probationary term, considering the mitigation evidence.

Mr. Campbell has served a term of pre-trial and appellate release that is about three and a half years lengthier than his maximum term of probation. 18 U.S.C. § 3561(c)(1). Were this Court to convert his 28-month term of imprisonment to an equivalent term of probation, his total period of supervision would be nearly thirteen years. Given the " 'substantial restrictions of freedom' involved in a term of supervised release or probation[,]" over such a long period of time, the reduction Mr. Campbell seeks from a 28-month term of imprisonment this Court originally imposed is not dramatic. *Gall v. United States*, 552 U.S. 38, 48 (2007). Though it would be a greater reduction from his Guidelines recommendation, the age of his prior convictions significantly mitigates his criminal history.

---

[11] *Supra,* n. 6, as well as US Sentencing Guidelines Manual Section 5H1.6, policy statement and commentary.

In December of 2015, Mr. Campbell had a total offense level of seventeen and a criminal history category of IV, based on six criminal history points. R53 (PSR) at 11. These six points stemmed from a seven-year initial sentence for an armed robbery committed when he was twenty-three years old, and an eight-year concurrent sentence for a felony theft by taking, committed when he was thirty years old, and for violating his parole for the armed robbery by committing this theft. *Id*. at 7.

At this point, it has been nearly fifteen years since his release from these concurrent prison sentences. Hence, were his PSR re-calculated after September 15th of this year, these offenses would no longer result in criminal history points, and his criminal history category would be I. *See* U.S.S.G. §4A1.1, app. note 1. This would reduce his Guidelines range from 37 – 43 months, to 24 – 30 months. The point of this counterfactual is not to relitigate his Guidelines, of course. The fact is those offenses were serious and they would still count towards his criminal history score as of the date of this filing.

But the policy behind the staleness requirement for old offenses should inform this Court's judgment in exercising its discretion in this case. The Commission reminds us in its introductory commentary to the Criminal History Section of the Guidelines that "[t]he specific factors included in §4A1.1 and §4A1.3 are consistent with the extant empirical research assessing correlates of recidivism and patterns of career criminal behavior." U.S.S.G., Ch. 4, Pt. A, "Introductory Commentary." Hence, "[l]ike its predecessor, the U.S. Parole Commission, the Sentencing Commission concluded that 'the correlation between a defendant's criminal history and predictable recidivism diminished after a prolonged period of conviction-free behavior.' "

Levine, James G., *The Armed Career Criminal Act and the U.S. Sentencing Guidelines: Moving Towards Consistency*, 47 Harv. J. on Legis. 537, 553 (2009) (citation omitted.)

Unstated "policy reasons" prevented the Commission from incorporating age into the criminal history Guidelines, notwithstanding the empirical research showing the correlation between this factor and recidivism. U.S.S.G., Ch. 4, Pt. A "Introductory Commentary." But it has nonetheless published its research documenting the decline of recidivism with age. U.S. Sentencing Commission, *The Effects of Again on Recidivism Among Federal Offenders* (2017)[12] The table below depicts the general trend:

*Table 1* **Overview of Age and Recidivism Study Findings Rearrest Recidivism Measure**

| | Younger than 30 Years n=6,796 | 30 to 39 Years n=8,523 | 40 to 49 Years n=5,894 | 50 to 59 Years n=2,969 | 60 Years or Older n=1,204 |
|---|---|---|---|---|---|
| **Percent** | 64.8% | 53.6% | 43.2% | 26.8% | 16.4% |
| **Median Time to Recidivism Event** | 17 Months | 22 Months | 22 Months | 25 Months | 28 Months |
| **Median Number of Recidivism Events** | 3 | 2 | 2 | 1 | 1 |
| **Most Serious Post-Release Event** | Assault (26.6%, n=1,170) | Assault (24.1%, n=1,102) | Assault (20.3%, n=517) | Other Public Order Offense (22.5%, n=179) | Other Public Order Offense (23.7%, n=47) |
| SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05_OFFUPDT. The Commission excluded cases from this analysis that were missing information necessary to perform the analysis. | | | | | |

---

[12] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (last visited February 3, 2023)

15

*Id*. at 22. Note that this table reflects a study by the Commission of the re-arrest rates of persons within eight years of their release from prison. *Id*. at 6. Again, Mr. Campbell was released from prison nearly fifteen years ago. He was arrested on this case in his early forties, consistent with the roughly 50-50 likelihood that a person in their forties might be re-arrested. Since then, he has maintained a lengthier period without getting into trouble.

The downward variance Mr. Campbell requests in this case is similar to the variance approved of by the Supreme Court in *Gall*, 552 U.S. 38. That case involved a young man who netted over $30,000 as part of a drug distribution conspiracy, stipulating that he was responsible for " 'at least 2,500 grams of [ecstasy], or the equivalent of at least 87.5 kilograms of marijuana.' " *Id*. at 41, 42 (citation omitted.) He voluntarily withdrew from the conspiracy after about four months, "self-rehabilitated[,]" graduated from college, and pursued a job in the construction industry. *Id*. Upon being approached by law enforcement, he was forthcoming about his involvement in the conspiracy. *Id*. at 42. Upon his indictment, he moved back to the district that indicted him and turned himself in. *Id*. During the pendency of his indictment, he started his own construction company, subcontracting to install windows and doors. *Id*.

Mr. Gall's guidelines range was 30 to 37 months, but the court varied downward, imposing a 36-month probationary sentence. The Supreme Court found the court was well within its discretion in doing so. It concluded the district court "quite reasonably attached great weight to Gall's self-motivated rehabilitation, which was undertaken not at the direction of, or under supervision by, any court, but on his own initiative." *Id*. at 59. It also found "it was not unreasonable for the District Judge to view Gall's immaturity at the time of the offense as a

mitigating factor, and his later behavior as a sign that he had matured and would not engage in such impetuous and ill-considered conduct in the future." *Id*.

Mr. Campbell's guidelines range was 37 to 46 months, though, as noted above, if it were recalculated in another 7 months, it would be 24 to 30 months. He was not particularly young when he possessed the firearm in this case, though the mere possession of a firearm in the trunk of his car, even as a convicted felon, was less culpable conduct than Mr. Gall's involvement in a major drug distribution conspiracy. And just as the district court could reasonably view Mr. Gall's youth as a mitigating factor, this Court could view Mr. Campbell's older age as a mitigating factor, especially in light of the empirical evidence published by the Sentencing Commission, suggesting that persons of Mr. Campbell's age are far less likely to reoffend, along with his law-abiding conduct while under eight and a half years of pre-trial release conditions. This record is relevant to a number of the 18 U.S.C. § 3553(a) sentencing factors – most obviously deterrence and public safety. While Mr. Gall's rehabilitation and record of good employment began before he was ever under supervised release, Mr. Campbell's record of good conduct and gainful employment has continued for over twice as long as Mr. Gall's was at the time of his sentencing. In short, Mr. Campbell's case for a probationary sentence is every bit as compelling as Mr. Gall's was, though for somewhat different reasons.

Again, it has now been nine years and one month since the offense conduct in this case, eight and a half years since this Court released him, fifteen years since his release from prison, and twenty-two years since the felony theft and parole violation that put him there. It has been almost thirty years since Mr. Campbell's most serious offense – an armed robbery that occurred when he was 23 years old. Mr. Campbell has followed each of this Court's orders and has been a

model supervisee over the lengthy course of this case. Now 52, he has settled into a simple and productive lifestyle, revolving around work, caring for his mother, and church. Any threat he once posed of recidivism or to public safety has diminished as his productivity and age have increased.

This Court may have a concern that granting such an extraordinary request in this case would lead to a flood of early release requests by means of *audita querela*. However, the equitable component of *audita querela* is a powerful gatekeeper, which explains why the continued availability of this writ has not already opened the floodgates of post-conviction litigation. For example, in *Carrington v. United States*, 503 F.3d 888, 893 (9th Cir. 2007), the Ninth Circuit affirmed the denial of an *audita querela* petition premised on the non-retroactive applicability of *United States v. Booker*, 543 U.S. 220 (2005), stating the petitioners had not shown "any evidence that they were uniquely impacted by the Guidelines or that there are any equities that distinguish them from other defendants sentenced before *Booker*."

Mr. Campbell's claim, in contrast, is distinguished by the unique procedural posture that permitted it to arise. Only rarely will a defendant have an opportunity to demonstrate, after the imposition of their sentence but before its commencement, and over such a long period of time, that they are amenable to probation. Only rarely will there be such time to demonstrate no recidivism, compliance with numerous conditions, consistent communication with the supervising officer, the process of "aging out" crime, and a consistent record of legitimate employment. Those stars have aligned in this unique case. This series of unlikely events provided Mr. Campbell a rare opportunity to demonstrate his fitness for probation, and there is no reason to turn a blind eye to his model conduct over the past eight and a half years.

This Court saw fit to sentence Mr. Campbell below his original Guidelines range of 37 to 46 months, and to keep him out on supervised release for the lengthy life of his appeal. He has vindicated this Court's judgment on these matters, acquitting himself well by all accounts, and hopefully showing the Court, and all interested parties, that he is a worthy candidate for a probationary sentence.

**CONCLUSION**

For the above reasons, Mr. Campbell respectfully requests that this Court grant this petition for writ of *audita querela*, and change his 28-month term of imprisonment to a 28-month term of probation, with all appropriate conditions.

Respectfully submitted this 21st day of February, 2023.

*s / Jonathan R. Dodson*
JONATHAN R. DODSON
FL Bar No. 0050177
Assistant Federal Defender

Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard
Suite 400
Macon, Georgia 31201
Tel: (478) 743-4747
Fax: (478) 207-3419
E-mail: jonathan_dodson@fd.org

**Certificate of Service**

I, Jonathan R. Dodson, hereby certify that on February 21, 2023, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such to all counsel of record.

*s / Jonathan R. Dodson*
JONATHAN R. DODSON
FL Bar No. 0050177
Assistant Federal Defender

Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard
Suite 400
Macon, Georgia 31201
Tel:  (478) 743-4747
Fax:  (478) 207-3419
E-mail:  jonathan_dodson@fd.orgg
